# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

JASPREET KAUR,

     Petitioner,

     v.

U.S. DEPARTMENT OF HOMELAND
SECURITY; U.S. CUSTOMS AND BORDER
PROTECTION; U.S. CITIZENSHIP AND
IMMIGRATION SERVICES; U.S. CUSTOMS
AND IMMIGRATION ENFORCEMENT;
U.S. DEPARTMENT OF JUSTICE;
WILLIAM P. BARR, Attorney General of the
United States; CHAD F. WOLF,
Acting Secretary of U.S. DHS; MARK MORGAN,
Acting Commissioner, United States Customs and
Border Protection; KENNETH T. CUCCINELLI,
Director of USCIS; CARLA L. PROVOST, Chief,
U.S. CBP; DAVID M. RADEL, Director, Los
Angeles Asylum Office, USCIS; ALANNA Y.
OW, District Director, San Diego District Office,
USCIS; DIANE BARRIOS, Field Office
Director, San Diego Field Office, USCIS;
GREGORY J. ARCHAMBEAULT, Field Office
Director for Detention and Removal, U.S.
Immigration and Customs Enforcement;
EDWARD RUIZ, Acting Warden, Imperial
Regional Detention Center, a Management &
Training Corporation (MTC) Group

     Respondents.

No. **'19CV2243 BEN MDD**

Agency File No. A201 740 749

PETITION FOR WRIT OF
HABEAS CORPUS
PURSUANT TO 28 U.S.C. § 2241

DETAINED

# INTRODUCTION

1.      Since June 5, 2019, Petitioner, JASPREET KAUR, a twenty-year-old, single female, Punjabi Sikh, native and citizen of India, has been held in Calexico, California at the Imperial Regional Detention Center, a privately owned and operated immigration detention facility run by the Management & Training Corporation (MTC) on behalf of U.S. Immigration and Customs Enforcement. JASPREET KAUR brings this habeas petition under the Suspension Clause, U.S. Const. art. I, § 9, cl. 2, to challenge the procedures that led to the issuance of an expedited removal order against him, and his continued detention.

2.      On August 14, 2019, over two months after initially being detained, JASPREET KAUR was provided a Credible Fear Interview by Asylum Officer, who at the conclusion of the hearing, found that JASPREET KAUR did not establish a credible fear of persecution and that "there is not a significant possibility that the applicant could establish eligibility for withholding of removal or deferral of removal under the Convention against Torture." An Immigration Judge at the Imperial Immigration Court issued a Final Order in Credible Fear Review Proceedings (expedited removal proceedings) that ordered JASPREET KAUR to be removed from the United States. The order states "This is a final order. There is no appeal available."

***True and correct copies of Record of Negative Credible Fear Finding and Request for Review by Immigration Judge, Notice of Referral to Immigration Judge, Notice and Order of Expedited Removal, Notice to Alien Ordered Removed/Departure Verification, Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act, and Record of Determination/Credible Fear Worksheet, are attached hereto as Exh. A.***

3.　　JASPREET KAUR is facing imminent deportation and removal to India. JASPREET KAUR fears persecution and fears for her life and safety if she is returned to India. JASPREET KAUR submits that she can show that her 4th and 5th amendment rights were violated on account of acts taken by the Respondents in disregard of substantive and procedural due process, and that she is being held, and was ordered removed, without having had a "meaningful opportunity to demonstrate that he is being held pursuant to 'the erroneous application or interpretation' of relevant law." *Boumediene v. Bush*, 553 U.S. 723, 779 (2008) (quoting *INS v. St. Cyr*, 53 U.S. 289, 302 (2001).

4.　　In yet another attempt to circumvent the codified and consistently reified American commitment to treat the asylum claims of everyone fairly, on April 30, 2019 the Trump Administration issued a new set of instructions (the "April 2019 Lesson Plan") to the hundreds of asylum officers who have the life-and-death responsibility of screening out those

baseless claims for humanitarian protection from the rest. Then on September 30, 2019, the administration followed up and issued and "Amended" the Lesson Plan and issued a "new version" titled, "Credible Fear of Persecution and Torture Determinations," dated September 24, 2019, and issued on September 30, 2019 (the "September 2019 Lesson Plan")

5. Rather than making a good-faith effort to administer the system Congress designed, the Administration issued biased, error-filled set of instructions designed to turn back as many asylum seekers as possible, in violation of the Immigration and Nationality Act ("INA"), the Refugee Act, the Convention Against Torture ("CAT"), the Administrative Procedure Act ("APA"), and the Constitution. Petitioner therefore seeks to have it vacated and enjoined.

6. The United States has long been committed to providing refuge to those fleeing violence and persecution, and Congress codified that commitment in the Refugee Act of 1980, which declares it to be "the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands." Refugee Act of 1980, § 101(a), Pub. L. No. 96-212, 94 Stat. 102.

7. Even in amending the INA in 1996 to permit immigration officers to summarily expel certain noncitizens from the United States on an

expedited basis, Congress was careful to honor our country's historic commitment to those seeking safe harbor by creating a screening process to ensure that anyone who might be eligible for asylum or related forms of humanitarian protection would avoid expedited removal and have full access to the immigration and federal court systems to make their claims. This "credible fear" assessment was deliberately designed to be a permissive standard to safeguard against the United States returning displaced people to dangerous conditions they fled, because doing so contravenes international and domestic law obligations.

8. Since taking office, however, President Trump and his Administration have pursued an explicitly nativist agenda of closing the borders to asylum seekers without regard to our national commitments, including those enshrined in law.

9. Most relevant to this case, the Administration has expressly adopted the goal of dramatically reducing the rate at which asylum seekers pass the initial, threshold "credible fear" screening step—the *only* avenue through which they can apply for humanitarian protection—so as to facilitate their expeditious return to the violence and persecution they fled.

10. In furtherance of the Administration's goal of turning away more asylum seekers, Defendants issued the Lesson Plans to the hundreds of

asylum officers who conduct these screenings. The Lesson Plans instructs the officers in a manner that is contrary to the governing statutes and regulations and substantially—and unlawfully—narrows access to the immigration and federal court systems.

11.     Among other things, the Lesson Plans improperly raise the asylum seeker's evidentiary burden; shift to asylum seekers burdens actually borne by the government; and convert what is supposed to be a non-adversarial, threshold screening into a biased and adversarial hearing through which asylum officers are to apply erroneous legal standards to decide ultimate issues that are supposed to await adjudication by the immigration courts.

12.     Petitioner is an asylum seeker who has been expeditiously ordered removed and is at imminent risk of physical removal because of the application of the Lesson Plans issued in April 2019 and September 2019, respectively. Petitioner, a young, unaccompanied single female, Punjabi Sikh in India, who fled India due to death threats, choking, beatings, and other forms of persecution by her mother-in-law who is very closely connected with the corrupt Indian government and police, Petitioner reached the U.S. border and sought asylum. However, Petitioner faces imminent removal because Petitioner was denied the opportunity to apply for protection when asylum

officers found she lacked a "credible fear".

13.     Petitioner seeks an order vacating Petitioner's expedited removal order and requiring that she be provided, at a minimum, with new credible fear screening under the proper legal standard. Petitioner additionally seeks a stay of her expedited removal.

14.     Absent relief from this Court, Petitioner will be unlawfully deported and condemned to her country of origin to face beatings and other forms of persecution and torture, including death.

15.     Petitioner also moves the court to issue an emergency order against the Respondents staying all deportation and removal actions against her, and to prevent her transfer from the jurisdiction of this court, such deportation, removal, and transfer being pursuant to a disregard of fundamental rights including the failure to provide her with a fair hearing and review before an Immigration Judge of a Negative Credible Fear Determination made by an Officer of the Arlington Asylum Office of U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security.

16.     Petitioner also moves that she be granted release upon a reasonable bond. To date, Petitioner has not been afforded any bond hearings.

## JURISDICTION AND VENUE

17.     This court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. § 1361 (jurisdiction over actions for mandamus to compel an officer of the United States to perform his or her duty); and 28 U.S.C. § 2241 (jurisdiction over habeas corpus actions). No other petitions, appeals, or motions have been filed with any other court.

18.     This court has jurisdiction to review Credible Fear Review determinations made by an Immigration Judge under the Suspension Clause, U.S. Const. art. I, § 9, cl. 2. *Thuraissigiam v. U.S. Department of Homeland Security, et. al*, 917 F.3d 1097 (9th Cir. 2019).

19.     This court also has jurisdiction over the present action pursuant to 28 U.S.C. §2201, the Declaratory Judgment Act; and 5 U.S.C. § 702, the Administrative Procedures Act.

20.     Venue in the Central District of California is appropriate under 28 U.S.C. §1391(e)(1) and (2) because the Petitioner is presently detained at the Adelanto Detention Center in Adelanto, California, and Respondents are stationed in, have offices in, and/or operate in this district.

## LEGAL CLAIM TO ASYLUM

21.     On June 5, 2019, JASPREET KAUR was taken into custody by U.S. Customs and Border Protection Officers at an unknown location along

the California southern border near Calexico, Mexico. She was transported to the Imperial Regional Detention Center where she was held in custody. She was placed in expedited removal proceedings pursuant to 8 U.S.C. § 1225(b)(1)(A)(i), 69 Fed. Reg. 48877-81; see also 8 U.S.C. § 1225(b)(1)(A)(iii)(II). *See Exhibit A*.

22. Petitioner was questioned and the officers noted that she claimed a credible fear of returning to India. *Id.* The Petitioner requested Asylum in the United States based on persecution in India. In support of her request for protection she provided evidence that she suffered past persecution and could very well suffer future persecution on account of being a young, unaccompanied single female, Punjabi Sikh in India who was targeted by her very highly connected mother-in-law due to her familial relationship. *Id.*

23. Petitioner's claim centers on being targeted due to her familial relationship, specifically, a young, unaccompanied single female, Punjabi Sikh in India dependent on a divorced household and being targeted by her stepmother, who has also targeted Petitioner's mother, and who is highly connected to the corrupt Indian government and police. The government is unable and unwilling to control Petitioner's persecutor.

24. Indeed, the petitioner has also established a well-founded fear of future persecution despite the IJ and AO's contrary opinions. Again, as the

petitioner asserts that she was credible and thus she did indeed suffer past persecution, she thus has a presumption of a well-founded fear of future persecution. *See, e.g.,* 8 C. F. R. Sec. 208.13 (b) (1) (i), 1208.13 (b)(l)(i). The government may rebut that presumption by showing:(A) There has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear; (B) The applicant could avoid persecution by relocating to another part of the applicant's country of nationality. 8 C.F.R. Sec. 208.13(b) (1) (i)(A)&(B), 1208.13(b)(l)(i)(A)&(B). Country conditions have not changed.

25. According to a report published on February 17, 2016, by Glob Public Health, domestic[1] violence, defined by India's Protection of Women from Domestic Violence Act of 2005, as physical, sexual, verbal, emotional, and economic abuse against women by a partner or family member residing in a joint family, plagues the lives of many women in India. National statistics that utilize a modified version of the Conflict Tactics Scale (CTS) to measure the prevalence of lifetime physical, sexual, and/or emotional DV estimate that

---

[1] According to Section 2(f) "domestic relationship" means a relationship between two persons who live or have, at any point of time, lived together in a shared household, when they are related by consanguinity, marriage, or through a relationship in the nature of marriage, adoption or are family members living together as a joint family;

40% of women experience abuse at the hands of a partner.[2] According to a recent survey[3] released by the Indian released by the Union health ministry in December 2017, 27 percent of women have experienced physical violence since the age 15 in India. This experience of physical violence among women is more common in rural areas than among women in urban areas. Domestic violence cases, where women reported physical abuse in rural and urban areas, were at 29 per cent and 23 percent, respectively. *Id*.

26.     Among the recently implemented written policies that subject individuals such as Petitioner placed into summary "expedited removal" proceedings to an unlawful screening standard- a standard which includes and intent to eliminate domestic and familial related violence committed by "non-state actors," are two precedential decisions issued by the Attorney General. On June 11, 2018, he Attorney General issued a decision in Matter of A-B-, 27 I&N Dec. 316 (A.G. 2018) overruling the *Matter of A-R-C-G-[4]* landmark decision by the Board of Immigration Appeals, which had recognized that domestic violence survivors may be eligible for asylum protection.

27.     On July 29, 2019, the Attorney General issued a decision in

---

[2] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4988937/
3 National Family Health Survey (NHFS-4) found at https://dhsprogram.com/pubs/pdf/FR339/FR339.pdf
4 Matter of ARCG-, 26 I&N Dec. 388 (BIA 2014)

*Matter of L-E-A-*, 27 I&N Dec. 582 (A.G. 2019) (LEA II), which purports to limit the ability of asylum seekers to establish a family-based particular social group. Similar to *Matter of A-B-*, 27 I&N Dec. 316 (A.G. 2018), the Attorney General in LEA II reversed a conclusion made by the Board in *Matter of L-E-A-*, 27 I&N Dec. 40 (BIA 2017) (LEA I), regarding the viability of a family-based particular social group, because of a procedural error the Attorney General identified in the Board's decision. Specifically, the Attorney General alleged that the Board's conclusion was the result of concessions by the Department of Homeland Security and not based on a case-by-case analysis of the social group at issue. 27 I&N Dec. at 596.4. These cases yielded new policies and practices by immigration agencies and adjudicators, as well as federal court litigation.[5]

28. Subsequently, USCIS issued a Policy Memorandum with the subject line: Guidance for Processing Reasonable Fear, Credible Fear, Asylum, and Refugee Claims in Accordance with *Matter of L-E-A*.[6] This Memo dictates that "Under the Attorney General's opinion in Matter of L-E-

_____

[5] See for instance, GRACE et al v. SESSIONS et al 1:18-cv-01853-EGS  which is currently pending at the District of Columbia District Court.
[6] Found at
https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/2019/USCIS_Memorandum_LEA_FINAL.pdf

A-, officers should no longer recognize family-based particular social groups based only on the general significance of family relationships in the society in question, or the sole fact that a particular family has been the target of private criminal activity. Instead, officers "must be careful to focus on the particular social group as it is defined by the applicant and ask whether that group is distinct in the society in question." *Matter of L-E-A-*, 27 I&N Dec. at 594. For social groups defined by a specific family, such as an applicant's father's immediate family, "the adjudicator must ask whether that specific family is 'set apart, or distinct, from other persons within the society in some significant way.' It is not sufficient to observe that the applicant's society (or societies in general) place great significance on the concept of the family." Id. (citing *M-E-V-G-*, 26 I&N Dec. at 238)."

29.    Petitioner alleges that the holding in the attorney general's *L-E-A-* decision is narrow, in that it merely overrule[s] the portion of *Matter of L-E-A-* discussing whether the proposed particular social group is cognizable. Similar to *Matter of A-B-*, the attorney general in *L-E-A-* determined that the BIA had relied on "concessions" by DHS, in this case that "'the immediate family unit of the respondent's father qualifies as a cognizable particular social group.'" 27 I&N Dec. at 584 (citing DHS's brief). The attorney general thus concluded that the BIA had not performed a fact-based analysis as to

whether Mr. L-E-A-'s proposed PSG met the three-prong test laid out in *Matter of M-E-V-G-*, 26 I&N Dec. 227 (BIA 2014), and *Matter of W-G-R-*, 26 I&N Dec. 208 (BIA 2014).

30.     Describing the BIA's 2017 L-E-A- decision, the attorney general states, "The Board here did not perform the required fact-based inquiry to determine whether the respondent had satisfied his burden of establishing the existence of a particular social group within the legal requirements of the statute. The Board's summary conclusions, based on DHS's stipulation rather than its own legal analysis, must therefore be reversed. Id. at 586

31.     Employing a similar structure to Matter of A-B-, the attorney general in L-E-A-did not decide that the type of PSG proposed in the case cannot constitute a cognizable PSG. In fact, the attorney general's L-E-A- opinion expressly states that it "does not bar all family-based social groups from qualifying for asylum." Id. at 595 Instead the attorney general overruled the BIA decision's PSG cognizability holding because, according to the attorney general, the BIA had not conducted the required analysis in issuing its precedent decision.

32.     Even though the holding of the attorney general's L-E-A- decision is quite narrow as noted above, the attorney general makes broad pronouncements in the decision predicting the likelihood of success on cases

not before him.[7] regarding the cognizability of family-based PSGs generally. It is in this part of the analysis that the attorney general seeks to radically change the accepted meaning of PSG. For example, he makes the following statements:

- "[U]nless an immediate family carries greater societal import, it is unlikely that a proposed family-based group will be 'distinct' in the way required by the [Immigration and Nationality Act (INA)] for purposes of asylum."  27 I&N Dec. at 595.

- "The fact that 'nuclear families' or some other widely recognized family unit generally carry societal importance says nothing about whether a specific nuclear family would be 'recognizable by society at large'. . . . The average family—even if it would otherwise satisfy the immutability and particularity requirements—is unlikely to be so recognized." Id. at 594

- "[M]any family-based social groups will have trouble qualifying as 'socially distinct,' a requirement that contemplates that

_____

[7] This tactic is similar to the one employed in the attorney general's 2018 decision in A-B-, where dicta in the decision went far beyond the narrow holding overruling Matter of A-R-C-G-, 26 I&N Dec. 338 (BIA 2014), for failure to conduct a complete PSG analysis, to make broad statements about types of cases not before him.

the applicant's proposed group be 'set apart, or distinct, from other persons within the society in some significant way.'" Id. at 593

- "[I]n the ordinary case, a nuclear family will not, without more, constitute a 'particular social group' because most nuclear families are not inherently socially distinct." Id. at 589

33.     Petitioner alleges that these statements are dicta and cannot be the basis for denying claims, particularly as the attorney general emphasizes the need for case-by-case analysis in asylum claims.

34.     In justifying the sweeping dicta described above, the attorney general engages in flawed analysis and disregarded decades of agency[8] and U.S. courts of appeals precedent concluding that family members can constitute a Particular Social Group (PSG). Some examples of the flaws in the decision's reasoning include the following:

---

[8] The initial, seminal BIA case on PSG was Matter of Acosta, 27 I&N Dec. 211 (BIA 1985), which employed the doctrine of ejusdem generis in interpreting PSG to require that membership in the group be immutable or so fundamental that the asylum seeker should not be required to change it. The BIA listed "kinship" as one example of a cognizable PSG. Id. at 233 ("The shared characteristic might be an innate one such as sex, color, or kinship ties, or in some circumstances it might be a shared past experience such as former military leadership or land ownership."). In Matter of H-, 21 I&N Dec. 337, 343 (BIA 1996), the BIA found that the "Marehan subclan" in Somalia met the PSG definition. In later cases, such as Matter of C-A-, 23 I&N Dec. 951 (BIA 2006), the BIA recognized a "social visibility" element for PSGs. In that case the BIA concluded that "former noncriminal drug informants working against the Cali drug cartel" did not meet the PSG definition but noted that "[s]ocial groups based on innate characteristics such . . . family relationship are generally easily recognizable and understood by others to constitute social groups." Id. at 959. In Matter of M-E-V-G-, 26 I&N Dec. 227 (BIA 2014), and Matter of W-G-R-, 26 I&N Dec. 208 (BIA 2014), the BIA clarified that there was never a requirement for "ocular visibility" for a PSG to be cognizable and renamed the "social visibility" requirement as "social distinction."

a. The attorney general rejects the BIA's 2017 conclusion in *L-E-A-* that the respondent was a member of the PSG of his father's immediate family because DHS had conceded that the PSG was cognizable—in other words, because both parties agreed that the respondent's father's immediate family was a cognizable PSG.[9] But the fact that both parties agree on a legal issue does not render their conclusion incorrect, particularly given DHS's role in interpreting immigration law. Furthermore, the BIA's decision in L-E-A was grounded in its recognition that the cognizability of a PSG is a "fact-based inquiry made on a case-by-case basis," (27 I&N Dec. at 42) and it reaches the conclusion that the proposed family based PSG is cognizable upon reviewing agency and U.S. courts of appeals precedents and "consider[ing] . . . the facts of this case" as well as the agreement of the parties. Id at 43.

b. In reaching the sweeping conclusion that "most nuclear families are not inherently socially distinct," the attorney general's

_____

[9] The attorney general states, "[T]he Board's particular social group analysis merely cited past Board and federal court precedents recognizing family-based groups and then agreed with the parties' stipulations." 27 I&N Dec. at 596.

decision improperly conflates the concepts of nexus and PSG. The decision, in rejecting the idea that families categorically qualify as PSGs, notes that most noncitizens are a member of a family. It reasons that this interpretation "would render virtually every alien a member of a [PSG]," summarily concluding that "[t]here is no evidence that Congress intended the term 'particular social group' to cast so wide a net." Id. at 593 In fact, there is direct statutory evidence that Congress did intend to cast a wide net in defining protected characteristics. One need look no further than the other protected grounds Congress recognized alongside PSG: race, religion, nationality, and political opinion. Each of these categories encompasses a "wide net" of people; in fact, virtually all people possess one or more characteristics that form a protected ground. Simply possessing a protected characteristic has never been a basis for winning asylum; the applicant must demonstrate a nexus between the feared harm and the protected characteristic.[10]

   c. The attorney general incorrectly applies the canon of

---

[10] See N.L.A. v. Holder, 744 F.3d 425, 439 (7th Cir. 2014) ("As the Board itself explained 'the fact that almost all Somalis can claim clan membership and that interclan conflict is prevalent should not create undue concern that virtually all Somalis would qualify for refugee status, as an applicant must establish he is being persecuted on account of that membership.'" (quoting Matter of H-, 21 I&N Dec. 337, 343 (BIA 1996)).

statutory interpretation, long used to interpret the term PSG, of ejusdem

generis. See, e.g., *Matter of Acosta*, 19 I&N Dec. 211, 233 (BIA 1985).

Under that canon, "when a statute sets out a series of specific items

ending with a general term, that general term is confined to covering

subjects comparable to the specifics it follows." *Hall St. Assocs., L.L.C.

v. Mattel, Inc.*, 552 U.S. 576, 586 (2008); accord *Kucana v. Holder*,

558 U.S. 233, 247 (2010). While the attorney general is correct that

ejusdem generis applies to interpreting what PSG means in the statute,

he merely asserts that PSG cannot be an "'omnibus catch-all' for

everyone who does not qualify under one of the other grounds for

asylum"[11] rather than applying this statutory interpretation canon. The

canon of ejusdem generis correctly applied actually refutes the attorney

general's reasoning that a proposed group cannot be a PSG merely

because many people would then share a protected characteristic. As

noted above, the other terms in the list—race, religion, nationality, and

political opinion—are all characteristics that many, and in some cases

---

[11] 27 I&N Dec. at 592. The attorney general cites a concurring opinion in Velasquez v. Sessions, 866 F.3d 188, 194 (4th Cir. 2017), a case in which the majority once again "recognized that an individual's membership in her nuclear family is a particular social group." 866 F.3d at 194.

most, or all, human beings have.

d. The decision compounds its flawed reasoning by noting that the term "family" is used ten times in INA § 101, the definitions section, and asserting that if Congress had intended to provide refugee status for those suffering persecution on account of family membership, "it would have included family identity as one of the expressly enumerated covered grounds for persecution." 27 I&N Dec. at 593

But there is no reason Congress would have included family based PSGs in the definitional section of the INA when the only reference to asylum in that section is the general refugee definition at INA § 101(a)(42), and there are no PSGs defined anywhere in the INA, as Congress left it to adjudicators to determine the parameters of PSGs. And in fact, as courts have concluded for decades, family groups clearly fall within the scope of the term PSG.

d. The decision acknowledges that its sweeping conclusions about family groups generally not qualifying as PSGs comes after numerous U.S. courts of appeals precedents recognizing family-based PSGs. Id. at 589 The attorney general fails in his attempt to explain why those precedents cannot withstand his opinion. See below for details on U.S. courts of appeals precedent on family-based

PSGs and the attorney general's treatment of these cases in L-E-A-.

35.     All U.S. courts of appeals that have reached the issue have concluded that family can be a PSG.[12]

36.     Also, the burden is on the government to demonstrate by a preponderance of the evidence that the applicant can reasonably relocate internally to an area of safety once there has been a finding of past persecution-and, as pointed out above, again, the petitioner contends that he did indeed suffer (past) persecution. *Melkonian v. Ashcroft*, 320 F.3d 1061, 1070 (9th Cir. 2003); *see also Mashiri v. Ashcroft*, 383 F.3d 1112, 112223 (9th Cir. 2004) (finding the IJ erred by placing the burden of proof on ethnic Afghan to show "that the German government was unable or unwilling to control anti-foreigner violence on a countrywide basis."). The reasonableness of internal relocation is determined by considering whether the applicant would face other serious harm in the place of suggested relocation; any ongoing civil strife; administrative, economic, or judicial infrastructure; geographical limitations; and social .and cultural constraints, such as age,

---

[12] For Ninth Circuit, see, Sanchez-Trujillo v. INS, 801 F.2d 1571, 1576 (9th Cir. 1986) (finding immediate family to be a "prototypical" PSG); Rios v. Lynch, 807 F.3d 1123, 1128 (9th Cir. 2015) (finding family to be a "quintessential" PSG).

gender, health, and social and family ties. *Knezevic v. Ashcroft*, 367 F.3d 1206, 1214-15 (9th Cir. 2004) (citing 8 C.F.R. § 1208.13(b)(3)).

37.     Indeed, the petitioner credibly testified that when she reported the harms perpetrated by her stepmother, the police did not and would not help her as her stepmother had familial ties to the police, who generally accept money in order to decline to investigate or prosecute cases. *See Exhibt A*. In fact, petitioner testified that one of her stepmothers' relatives holds the position of SHO, Station House Officer.

38.     The Petitioner also testified that with the help of the police, the stepmother had harmed Petitioner's mother by successfully setting her up where "they created some documents in the name of my mother but they transferred that to the name of my stepmother. At which time my stepmother harmed my mother, if that can happen to my mother, then my step mother can harm me."

39.     Petitioner further testified that she unable to internally relocate because she and her mother did not have any other relatives anywhere (other than from Petitioner's father's side) and "All my relatives are of my father, they do not like my mother." Petitioner further testified that both her and her mother as unaccompanied females who entirely depended financially on Petitioner's father, did not "have the kind of money to start our life by

ourselves. I will have to by force go live with relatives and they don't like us."
Id.

40.     Therefore, Petitioner could go nowhere else in India, practically speaking. Single unaccompanied females all over India face an array of risks and dangers, including sexual harassment and exploitation by men. The practice remains a depressingly common phenomenon in India, where a woman is sexually harassed every twelve minutes.[13]

41.     According to statistics recently released by the National Crime Records Bureau (NCRB), of states, Uttar Pradesh recorded the most sexual harassment cases that year, with 5,830. Madhya Pradesh followed with 2,985 cases, with Maharashtra placing third, reporting 2,910 cases. Of cities, Delhi recorded the most cases of sexual harassment in India in 2017, with 613, followed by Mumbai, with 391, and Kanpur, with 162. Telangana recorded more cases of sexual harassment in the workplace than any other state. Bihar was the state to record the most cases of sexual harassment on public transport.14 The NCRB data highlighted the plight of women in shelter homes.

---

[13] See report entitled, Progress of Sexual Harassment Law in India, China and Hong Kong, published by Harvard International Law Journal.
[14] ncrb.gov.in › CII › NEWPDFs › Crime in India - 2016 Complete PDF 291117

The maximum number of cases of sexual harassment in shelter homes was reported in Pune, followed by Mumbai. Uttar Pradesh reported more sexual harassment cases in shelter homes than any other state (239), followed by Andhra Pradesh (65) and Maharashtra (64). "[Fewer than] one percent of sexual harassment cases [in shelter homes] come out," reported Lek Ladki Abhiyan, a movement focused on the issues facing Maharashtra's girls and women. "This is because such shelters are operated by party workers. We have repeatedly approached the government to introduce an SOP [standard operating procedure] but there is no positive reply." "The internal committees that are set up both in government and private sectors do not have the teeth to act on complaints of sexual harassment," said Maharashtra State Commission for Women chairperson Vijaya Rahatkar. "Members of such committees are not aware of the law and are afraid of taking any action against seniors. This was one of the reasons few people coming forward to lodge complaints. We have asked the government to make it compulsory for the staff of corporate sector to undergo online training on sexual harassment to make them aware of their rights." *Id*.

42. The Department of Homeland Security (DHS) must be able to show not just that it is possible for the petitioner to internally relocate, but that it would be reasonable under the circumstances for the petitioner to do so.

*Melkonian v. Ashcroft*, 320 F.3d 1061, 1069 (9th Cir. 2003); *see also Boer-Sedano v. Gonzalez*, 418 F.3d 1082, 1091 (9th Cir. 2005). Courts may consider "any ongoing civil strife within the country; administrative, economic, or judicial infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health, and social and familial ties." Id.

43.     Furthermore, under *Matter of Mogharrabi*, 19 I&N Dec. 439, 445(BIA 1987), Petitioner has also established a well-founded fear-which, of course, requires that she show that she has only a one-in-ten chance of being persecuted by the Indian government, or individual or groups it is unable or unwilling to control. The well-founded fear test requires both a subjective component (fear) and an objective component (a reasonable possibility of persecution). Petitioner, of course, definitely fears returning to India. She thus has the subjective fear. She also has met the objective component. Sufficient evidence for the objective component is established by showing that "the alien possesses a characteristic a persecutor seeks to overcome by punishing the individuals who possess this characteristic, that a persecutor has the capability of punishing the alien, and that a persecutor has the inclination to punish the alien." *Matter of Mogharrabi, supra* at 446. Petitioner, a young, unaccompanied single female, Punjabi Sikh in India who was targeted by her

very highly connected mother-in-law due to her familial relationship, possesses a characteristic from which the government, via corruption and nepotism, has demonstrated is unable and willing to protect Petitioner from.

## ASYLUM OFFICER'S NO CREDIBLE FEAR FINDING PREJUDICAL

44.     On August 14, 2019, over two months after being detained, an Asylum Officer from the Arlington Asylum (Pre-Screening) Office, U.S. Citizenship and Immigration Services (USCIS), conducted a Credible Fear Interview of JASPREET KAUR to make an initial assessment of her asylum claim. The interview was conducted over the phone with a Punjabi to English language translator on another line. *See Exhibit A*.

45.     After a very brief interview, and without writing down any sort of explanation or articulating the basis for his decision as has been common practice for decades, the asylum officer, Dax Tipton, simply checked the applicable boxes that indicated, "You have not established a credible fear of persecution in your country of nationality, country of last habitual residence, or country to which you have been ordered removed because: .. There is no significant possibility that you could establish in a full hearing that the harm you experienced or fear was/is sufficiently serious to amount to persecution." The asylum officer went on to check the box that indicated, "You have not

established a credible fear of torture in a country to which have been ordered removed because you have not established that there is a significant possibility that: .. You would suffer severe physical or mental pain or suffering." An immigration judge (IJ) subsequently agreed.

46.    During the interview, JASPREET KAUR declared, in sum, that she attacked repeatedly, threatened with death and even choked by her stepmother who has high familial connection with the Indian government and police, for refusing to leave her father's home. The petitioner reported the harm to and sought help from the local police station who refused to help her due to said connection with the police by her persecutor. *Id*

*47.*    Here, there was evidence that Petitioner was credible in his testimony as she was very consistent and detailed and that Petitioner should be entitled to the relief of asylum. Her claim is also consistent with country conditions in India. Furthermore, the Asylum Officer, Dax Tipton, did find JASPREET KAUR'S testimony to be credible.

48.    However, Officer Tipton went on to focus exclusively on the issue of future persecution and relocation and squarely placed the burden on Petitioner to prove that she could not internally relocate. She stated that she was alone only with her mother who had no other relatives in India and that they both were completely dependent on Petitioner's father, who Petitioner's

persecutor, her stepmother had control over, and that in their specific social profile, they could not survive anywhere else in India. *Id.*

49.    Petitioner requested review of the negative credibility finding by an Immigration Judge. *Id.* This same above analysis applies to the Immigration Judge hearing. The IJ affirmed Mr. Dixon's findings. The IJ did not explain the basis of non-credibility finding.  See *Exhibit A*.

BACKGROUND OF RIGHTS OF ASYLUM SEEKERS AND THE TRUMP ADMINISTRAITON'S RECENT STANDARD CHANGES

**Rights of Asylum Seekers and Limits on the Executive's Removal Authority**

50.    Congress has enshrined in U.S. law special protections for individuals fleeing persecution or torture, consistent with the humanitarian commitments of the United States under treaties including the 1967 Protocol Relating to the Status of Refugees and the Convention Against Torture.

51.    In enacting the Refugee Act in 1980, Congress "declare[d]" that the Act's purpose was to codify "the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands." § 101(a), 94 Stat. 102.

52.    Consistent with that historic commitment, *all* noncitizens at or within U.S. borders generally have a right to apply for asylum—a form of

protection available to individuals who can prove that they are "refugee[s]" within the meaning of the INA for having suffered persecution in the past or having a "well-founded fear" of persecution in the future.

53.     Other provisions of U.S. law prohibit the government from removing noncitizens to countries where they face persecution or torture, even if they are not granted asylum. *See* 8 U.S.C. § 1231(b)(3); Convention Against Torture, Art. 3; 8 C.F.R. § 208.16(c), (d). Rather, when appropriate, the government must grant the noncitizens protection in the form of withholding of removal under the INA, *see* 8 U.S.C. § 1231(b)(3), or withholding or deferral of removal under the CAT, *see* 8 C.F.R. § 208.16(c)(4).

54.     The principle of *non-refoulement* reflected in these Executive and legislative commitments, moreover, is also a part of customary international law, which likewise provides for the right to seek and receive asylum, mandates a fair process for determination of protection claims, and prohibits torture and cruel, inhumane, and degrading treatment.

### Expedited Removal and the Credible Fear Screening Safeguard

55.     Before 1997, any noncitizen that the federal government wished to remove from the United States generally was entitled to a full hearing before an immigration judge, with opportunities to challenge the alleged

grounds for her removal and to apply for relief from removal, including asylum.

56. With the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, which went into effect in 1997, Congress created an expedited removal system through which immigration officers outside the judicial system may order removed certain noncitizens without providing them an opportunity to apply for relief from removal, and "without further hearing or review." 8 U.S.C. § 1225(b)(1)(A)(i); *see also id.* § 1225(b)(1)(B)(iii)(I).

57. Reflecting our country's commitment to asylum seekers, however, and to avoid the possibility of unlawfully and inhumanely sending individuals back to persecution, Congress took care to ensure that any noncitizen who "indicate[d] either an intention to apply for asylum under [8 U.S.C. § 1158] or a fear of persecution" would be accorded some process before they could be removed—including, potentially, a full hearing before an immigration judge and subsequent review by the Board of Immigration Appeals and federal appellate courts. 8 U.S.C. § 1225(b)(1)(A)(i); 8 C.F.R. § 208.30(f).

58. Thus, if noncitizens in the expedited removal system indicate that they intend to apply for asylum or fear persecution, immigration officers are required to refer them for interviews before asylum officers to determine

if they have a "credible fear of persecution." 8 U.S.C. § 1225(b)(1)(B)(ii); *see also id.* § 1225(b)(1)(A)(ii). Throughout the credible fear screening process, the asylum seekers are subject to mandatory detention. *Id.* § 1225(b)(1)(B)(iii)(IV). Asylum seekers have a right to consultation, but not representation, during credible fear interviews. *Id.* § 1225(b)(2)(B)(iv).

59.     If an asylum officer determines that an asylum seeker has a "credible fear of persecution," the officer must refer the case to immigration court for a full hearing on whether the individual is subject to removal in the first place and, if so, whether the asylum seeker is eligible for protection such as asylum. If, after the hearing and any appeals, the asylum seeker is found to be removable and ineligible for protection, he or she is ordered removed. *See* 8 U.S.C. §1225(b)(1)(B)(ii); 8 U.S.C. § 1229a; 8 C.F.R. § 208.30(f).

60.     Since the adoption in 1999 of regulations implementing the Convention Against Torture—which bars the government from removing noncitizens to countries where they will be tortured—the credible fear safeguard has applied also to those who indicate a fear of torture and are deemed to have a "credible fear of torture." 8 C.F.R. § 208.30(e), (f).

61.     When asylum officers determine that asylum seekers do not have a credible fear of persecution or torture, they are ordered removed "without further hearing or review." 8 U.S.C.§ 1225(b)(1)(B)(iii)(I).

62.    At this stage, asylum seekers may request review by an immigration judge, but the judge's review is limited to assessing the credible fear determination and is based on the record developed and relied on by the asylum officer. *See* 8 C.F.R. § 1208.30(g)(2). If the immigration judge affirms—which is typically done through a checkbox form, with no explanation—the individuals are removed. With few exceptions, there is no statutory or regulatory right to further review of this crucial gatekeeping function. *See* 8 U.S.C. § 1225(b)(1)(B)(iii); 8 C.F.R. § 1208.30(g)(2)(iv)(A), (B).

## Conduct of Credible Fear Screenings

63.    Congress designed the credible fear standard to enable asylum officers to quickly screen out frivolous asylum claims while permitting those that are potentially meritorious to be adjudicated by immigration judges.

64.    In doing so, Congress created what the Department of Justice has recognized as a "low threshold of proof of potential entitlement to asylum," 62 Fed. Reg. 10,312, 10,320 (Mar. 6, 1997). As provided in the governing statute, "the term 'credible fear of persecution' means that there is a significant *possibility*, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien *could establish* eligibility for asylum under

[8 U.S.C. § 1158]." 8 U.S.C. § 1225(b)(1)(B)(v) (emphases added); *see also* 8 C.F.R. § 208.30(e) (same).

65.     Reflecting its purpose and the circumstances of those who have just arrived at our borders fleeing violence and other forms of persecution, the interview must be conducted "in a non-adversarial manner," with the asylum officer required "to elicit all relevant and useful information bearing on whether the applicant has a credible fear of persecution or torture." 8 C.F.R. § 208.30(d).

66.     Asylum officers must receive special training in "international human rights law, non-adversarial interview techniques, and other relevant national and international refugee laws and principles." 8 C.F.R. § 208.1(b).

67.     At the credible fear stage, the asylum officer's mandate is not to adjudicate the claim (or any part thereof) on the merits, but rather to determine—on information that is circumscribed both by statute and by practical considerations—whether the asylum seeker *might* establish eligibility for asylum if given that opportunity through formal removal proceedings.

68.     There is no statutory or regulatory requirement that asylum seekers produce any evidence beyond their own testimony at the credible fear stage.

69. Nor is the credible fear stage suited to complex factfinding. Asylum seekers typically are recent arrivals with little to no knowledge of U.S. immigration law, scant opportunity to marshal relevant evidence and even to identify pertinent information, and limited access, if any, to counsel. Many are struggling with the trauma associated with persecution in their home countries and their flight to the United States, as well as trauma and stress associated with their detention by U.S. immigration officials. The screening, furthermore, is required by law to be non-adversarial. The asylum officer who makes the determination as to credible fear need not be an attorney.

70. As a formal matter, the credible fear screening is not considered to be part of the application for asylum, which can be filed as late as a year after the asylum seeker's arrival (or even later in certain circumstances).

71. Negative credible fear determinations nonetheless remain a part of the procedural histories of the cases in which they are issued.

72. Even if later vacated, a negative credible fear determination by an asylum officer can make it more difficult for the asylum seeker to ultimately be found eligible for or be granted relief from removal.

73. Even after an asylum seeker has been served a notice to appear and placed in formal removal proceedings under 8 U.S.C. § 1229a, the government can return the asylum seeker to the expedited removal process.

## **Defendants' Policy to Drive Down the Credible Fear Passage Rate**

74.     As a candidate, President Trump ran an explicitly nativist campaign that demonized immigrants and refugees, particularly those who are not (or are not perceived as) white.

75.     Since taking office, President Trump has acted on his nativist promises, making unprecedented policy changes to advance his agenda without any regard for the law or the devastating impact that they would have on the lives of those who come to the United States seeking refuge.

76.     For example, almost immediately upon taking office, President Trump ended the Central American Minors ("CAM") program. Under that program, minor children in the Northern Triangle countries of El Salvador, Guatemala, and Honduras with parents lawfully present in the United States could apply in their home country to be considered for refugee status, which otherwise required them to make the perilous overland journey to the United States' southern border. When President Trump took office, approximately 2,700 children had been conditionally approved for humanitarian parole through the program, and were set to be safely reunited with their parents lawfully present here. Following the shutdown of the program—which was first done in secret, and then publicly announced some eight months later— those conditional approvals were rescinded, *en masse*, in a decision that was

later held unlawful and enjoined. *S.A. v. Trump*, No. 18-cv-03539-LB, 2019 WL 990680 (N.D. Cal. Mar. 1, 2019) (preliminary injunction decision); *see also S.A. v. Trump*, No. 18-cv-03539-LB, 2019 WL 1593229 (N.D. Cal. Apr. 12, 2019) (agreement regarding permanent injunction).

77.    The next summer, the Trump Administration implemented a widely criticized policy of forcibly separating migrant parents from their children. Administration officials have admitted that the goal of the separation was to discourage Central American families from traveling to the border and applying for asylum.  The separation policy was challenged as unlawful, and a federal judge granted a classwide preliminary injunction. *Ms. L v. U.S. Immigration & Customs Enf't*, 310 F. Supp. 3d 1133 (S.D. Cal. 2018). The Trump Administration estimates it could take it two more years just to identify thousands of migrant families that it forcibly separated, and even longer to reunify them.

78.    Likewise, in November 2018, the Trump Administration sought to render ineligible for asylum noncitizens who entered the United States outside of a port of entry, in defiance of statutory language explicitly making such individuals eligible. That policy, too, has been preliminarily enjoined. *East Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094 (N.D. Cal. 2018), *stay pending appeal denied*, 909 F.3d 1219 (9th Cir. 2018), 139 S. Ct. 782

(2018).

79.     Most relevant to this case, the Trump Administration has also sought to make it more difficult for those from Central America to pass credible fear screenings and to apply for asylum. These changes were enjoined by a court in this district in *Grace v. Whitaker*, 344 F. Supp. 3d 96 (D.D.C. 2018), *appeal docketed*, No. 19-5013 (D.C. Cir.).

80.     As well as through these policies that have already been enjoined by courts, President Trump has made clear through his words—including materially false and misleading statements about the immigration system—his intent to destroy the asylum system and the credible fear process that Congress mandated.

81.     The President has personally directed blatantly illegal actions targeting asylum seekers.

82.     In March 2019, President Trump ordered then-Secretary of Homeland Security Kirstjen Nielsen to close the El Paso port of entry and at the very least to deny entry to asylum seekers; Secretary Nielsen refused, and shortly thereafter was forced to resign.

83.     Similarly, in a visit to the United States' southern border in April 2019, President Trump personally directed Border Patrol agents to turn asylum seekers away and to explain to any judge finding fault with that action, "Sorry,

judge, I can't do it. We don't have the room."

84.     By then, the Administration had already, in fact, adopted policies that have the purpose and effect of turning away asylum seekers, including through its "metering" program, under which the only way many asylum seekers can exercise their statutory right to request asylum is to cross the border illegally, between ports of entry, and to surrender themselves to the first Border Patrol agent they can find.

85.     In recent months, a number of asylum seekers, including children, have died attempting to apply for asylum by crossing between ports of entry, as the conditions are frequently treacherous. Several asylum seekers have died attempting to cross rivers. Others have died trying to cross the desert.

86.     Members of the Administration have shown little remorse when confronted with the awful consequences of their policies. The President has attempted to shift blame to the victims, repeatedly denigrating asylum seekers without any factual basis, suggesting that they are lying, "invading" fraudsters who are "not afraid of anything," and dehumanizing them to the point of comparing them to animals. In May 2018, President Trump said of people crossing the Mexican border into the United States: "You wouldn't believe how bad these people are. These aren't people. These are animals."

87.     The President has repeatedly opined that the entire asylum system is fraudulent, ignoring that it is a system created by Congress in compliance with the United States' international obligations. In April 2019, President Trump repeatedly called the asylum system "a big, fat con job." Furthermore, just before filing of this suit, President Trump threatened massive immigration raids across the country targeting women and children if Democrats did not work together with Republicans to find a solution to the "loophole" of migrants fleeing persecution having the right to ask for asylum in this country.

88.     The Executive agencies under the President have also participated in disseminating false information about the asylum system. This spring, the Executive Office for Immigration Review issued a "fact" sheet that, among other things, dismissed as a "myth" the notion that "[m]ost aliens who claim a credible fear of persecution have meritorious asylum claims." In response to the "fact" sheet, the National Association of Immigration Judges issued a press release declaring the document to be "filled with errors and misinformation."

89.     Similarly, a group of retired immigration judges and retired members of the Board of Immigration Appeals wrote an open letter to the Director of the Executive Office for Immigration Review that condemned the

"fact" sheet as "political pandering, at the expense of public faith in the immigration courts," for presenting "imagined 'myths' and wildly inaccurate and misleading information labeled as 'fact.'" True "American courts," they cautioned, "do not issue propaganda implying that those whose cases [they] rule[] on for the most part have invalid claims[,] . . . or that those unable to surmount the government-created obstacles to filing asylum applications are somehow guilty of deceit." "Such statements," they continued, "indicate a bias which is absolutely unacceptable and, frankly, shocking."

90.    With recent changes in Administration staff, Defendants have renewed their focus on credible fear screenings, making it a priority to drive down the rate at which asylum seekers pass the screenings and avoid summary deportation.

91.    Indeed, Defendant Wolf and Defendant Cuccinelli were recently tapped to lead DHS and USCIS, respectively, for their willingness to take more aggressive stances than their predecessors to restrict applications for humanitarian relief.

92.    Shortly after assuming his role, Defendant Cuccinelli admonished USCIS staff to do "[their] part to help stem the crisis and better secure the homeland" when conducting credible fear screenings. His message was considered by many who received it to be a thinly veiled threat that

asylum officers would be blamed for the Administration's failings if the credible fear passage rate did not materially drop.

93.     In a further effort to lower the credible fear passage rate, Defendants have also begun recruiting CBP officers, who are expected to be more "aggressive" with asylum seekers at the border, to conduct credible fear screenings.

94.     On April 9, 2019, a senior Administration official reported that the Administration would be implementing policy changes to make it more difficult for those asserting a fear of persecution or torture to access the U.S. immigration and federal court systems. Regarding credible fear screenings, the official said that asylum officers would "apply greater rigor and scrutiny to . . . [asylum] claims," and suggested that DHS might mobilize assistance from the Department of State in order to further drive down the credible fear passage rate.

## **The Lesson Plans**

95.     On April 30, 2019, the USCIS RAIO Directorate issued a final written "Lesson Plan" on "Credible Fear of Persecution and Torture Determinations." Shortly thereafter, Reuters published the Lesson Plan, *a true and accurate copy of which is attached as Exhibit B*. ("April 2019 Lesson Plan")

96. On September 30, 2019 USCIS amended the Lesson Plan and issued a new version titled, "Credible Fear of Case Persecution and Torture Determinations," dated September 24, 2019, and issued on September 30, 2019, *a true and accurate copy of which is attached as Exhibit C* ("September 2019 Lesson Plan")

97. The Lesson Plans are policy documents that control the conduct of asylum officers in the credible fear process.

98. When promulgating regulations on the expedited removal process, the Department of Justice declined to elaborate on the credible fear standard, reasoning that asylum officer training—founded on documents like the Lesson Plans—would be "extensive" in order to control how the credible fear standard was "applied to particular cases" and to "ensure that the standard [wa]s implemented in a way which w[ould] encourage flexibility and a broad application of the statutory standard," consistent with Congress' aim. 62 Fed. Reg. 10,312, 10,317 (Mar. 6, 1997).

99. Here, however, the Lesson Plans execute Defendants' policy to drive down the credible fear passage rate by directing asylum officers to conduct interviews in a manner that is contrary to the statutory scheme, binding regulations, judicial precedent, and longstanding practice. It does so in myriad ways.

100.    For example, the Lesson Plans effectively convert the credible fear determination from an inquiry into whether an asylum seeker *could* establish eligibility for relief in the future into an adjudication on whether the asylum seeker actually *has* established eligibility.

101.    Throughout the Lesson Plans, Defendants suggest that the asylum seeker's ability to succeed on a credible fear determination will hinge on her ability to fully establish eligibility for relief in all of its intricacies. Among other things, the Lesson Plans:

    a.  require the asylum seeker to identify specific facts sufficient to establish eligibility for asylum in order to be found to have a credible fear, even if such facts are not and would not be expected to be within the asylum seeker's knowledge;

    b.  require the asylum seeker to establish "a significant possibility of future persecution," when the credible fear standard merely requires a significant possibility of establishing eligibility, and even the substantive asylum standard requires only a "*well-founded fear* of persecution," for which the Supreme Court has held a 1 in 10 chance of future persecution is sufficient; and

    c.  otherwise misrepresents the relevant asylum standards by failing to present them according to the controlling question of whether the

asylum seeker has a significant *possibility* of meeting those standards in the future.

102. The Lesson Plans also increase the evidentiary burden the asylum seeker must carry to pass a credible fear screening by, among other things, imposing an unlawful corroboration requirement; requiring the asylum seeker to present "more than 'significant evidence'" of eligibility, contrary to the applicable standard; unlawfully prohibiting asylum officers from making allowances for special circumstances—such as trauma, the passage of time, or cultural considerations—that may make it difficult for the asylum seeker to present her story in the setting of the credible fear screening; and placing the onus on the asylum seeker to produce testimony that is in fact the officer's duty to elicit.

103. Relatedly, the Lesson Plans turn what the law requires to be a non-adversarial interview into an adversarial process that is biased against the asylum seeker, with the asylum officer functioning at once as opponent and arbiter. Among other things, the Lesson Plans:

a. require—in contravention of binding regulations—asylum officers to measure the asylum seeker's statements against information in Department of State-issued reports that the current Administration recently revised to remove accurate

information helpful to asylum seekers, and to treat the reports as "objective" fact;

b. instruct asylum officers—in contravention of law—that they need not provide the asylum seeker with an opportunity to address concerns that might lead to a negative credibility determination; and

c. encourage asylum officers to find ways to use prior statements to Border Patrol to impeach the asylum seeker.

104. In addition, the Lesson Plans misrepresent the substantive law to be considered by the asylum officer to evaluate potential eligibility for asylum or other humanitarian protection, and in ways that prejudice applicants. For example, the Lesson Plans:

a. double down on an erroneous construction of private actor persecution that was enjoined by *Grace v. Whitaker*, 344 F. Supp. 3d 96, 107 (D.D.C. 2018), by instructing that "the government [in the asylum seeker's country of origin] must have abdicated its responsibility to control persecution" for harm due to actions of a private actor to constitute persecution;

b. mischaracterize controlling Supreme Court and other case law so that asylum officers will determine that no credible fear exists,

when a faithful application of the law would (or at the very least could) lead to the opposite result;

c. direct asylum officers to make negative credible fear determinations based on what are actually *discretionary* factors, not *eligibility* criteria, such as when there is a significant possibility that the asylum seeker could establish past persecution; and

d. as to discretionary factors related to past persecution and so-called "humanitarian asylum" that are improper to consider at the credible fear stage in the first place, mischaracterize the respective burdens on the government and the asylum seeker.

105.    In still other ways, the Lesson Plans are simply irrational. For example, they require asylum officers to specify the bases for a positive credibility finding, but not for a negative one. And in a series of footnotes, they create a complicated set of conditional instructions that are triggered "[i]f the order in *Grace v. Whitaker*, 344 F. Supp. 3d 96 (D.D.C. 2018), is lifted," without explaining what would qualify as that order being "lifted," and with seemingly no regard for the likelihood that these instructions would cause confusion if they were ever even arguably triggered.

106.    The Lesson Plans are problematic as well for what it omits from

previous guidance, without explanation or even acknowledgment. For example, the Lesson Plans omit the regulation- based instruction that "novel or unique issues . . . merit consideration in a full hearing before an immigration judge" even if a negative credible fear determination might otherwise seem warranted, 8 C.F.R. § 208.30(e)(4); omit instruction in other applicable law and procedure that is helpful to the asylum officer and favorable to the asylum seeker; and otherwise modifies longstanding guidance to artificially and unlawfully achieve the Administration's aim of decreasing the number of individuals who pass credible fear screenings.

107. In their sum and parts, the Lesson Plans are not consistent—in letter, spirit, or purpose—with the statutes, regulations, or caselaw on which it purports to instruct and guide.

## HABEAS CORPUS REQUEST

108. Petitioner is subject to being removed and deported at any time, and she is afraid that her removal and deportation from the United States will be very soon.

109. Petitioner submits that she was treated terribly by the government and the Immigration Judge, and requests that the court grant her Petition for Writ of Habeas Corpus and grant her request for a stay of removal during the course of any pending Habeas Corpus proceedings or other

relevant proceedings, and to also stay any transfer or relocation to another detention facility while such proceedings are pending in this court, and also request that in lieu of continued detention that she be considered for release upon posting of a reasonable bond as soon as possible.

110.    Petitioner has not been convicted of an aggravated felony or other serious crime that would bar asylum, humanitarian asylum, withholding of removal, or protection under Article 3 of the U.N. Convention Against Torture.

111.    Petitioner's detention and the Respondents' actions against her are unlawful and in violation of the Constitution of the United States and the laws of the United States, and the Respondents' efforts and actions to deport and remove her do not comply with substantive and procedural due process, and fail to meet the most basic requirements of the Suspension Clause, and thus the detention and removal orders are faulty and without legal force.

112.    Petitioner seeks a writ of habeas corpus ordering that she be presented to this Court to allow her to have a correctly conducted Credible Fear Review Proceeding that will allow her to subsequently apply for and have his claims for asylum, humanitarian asylum, withholding of removal, and for protection under Article 3 of the U.N. Convention Against Torture be properly adjudicated by a U.S. Asylum Officer and an Immigration Judge.

113.     Petitioner seeks a declaratory judgment that Respondents are in violation of law for not allowing proper filing and proper adjudication of Petitioner's Credible Fear Review Proceedings, asylum, humanitarian asylum, withholding of removal, and for protection under Article 3 of the U.N. Convention Against Torture claims. Respondents have acted in violation of their duties and responsibilities by detaining her without following proper procedures to allow her to file her claims and to have them properly adjudicated.

114.     The habeas corpus statute, 28 U.S.C. § 2243, requires that upon the filing of a Petition for Writ of Habeas Corpus, the court "shall forthwith award the writ or issue an order directing the respondent to show cause why the writ should not be granted. . . ." Respondents are currently holding the Petitioner in actual detention/custody at the Imperial Regional Detention Facility located in San Diego, California, where she is facing imminent removal/deportation from the United States to India.

115.     It is respectfully submitted that the actions taken by the Respondents violate the international law principle of non-refoulement, the customary Law of Nations which forbids the rendering of a victim of persecution to their persecutor, and the obligations of the United States under the 1967 United Nations Protocol Relating to the Status of Refugees, which

the U.S. acceded to in 1968. Opened for signature January 31, 1967, 19 U.S.T. 6223 T.I.A.S. No. 6577, 606 U.N.T.S. 267 (1967).

116.    The 1967 United Nations Protocol adopted Articles 2 through 34 of the United Nations Convention Relating to the Status of Refugees which has been in force since 1951, opened for signature July 28, 1951, 189 U.N.T.S. 150, 152 (1951), and is especially important because it governs the treatment of asylees and persons fleeing persecution, and because it contains provisions, such as the definition of "refugee," and the absolute prohibition under Article 33 against return of a person whose life or freedom would be threatened in the country she or he fled. 38. We further submit, therefore, that all of the decisions and actions of the Respondents, including the Department of Justice component agencies and offices, including EOIR and the Immigration Courts, and DHS, and all of the DHS component agencies and offices, including ICE, USCIS, the Asylum Division of USCIS, and all of the respective officers and attorneys of the respective departments, agencies, and offices, were without foundation in law, ignored applicable statutory provisions and regulations, violated international law and the treaty obligations of the United States, denied Petitioner's substantive and procedural due process, are fundamentally an abuse of discretion, and have caused Petitioner to suffer undue hardship and an unwarranted threat of imminent removal and deportation to India.

Finally, Petitioner has verified this Petition for Writ of Habeas Corpus. *A true and correct copy of said Verification is attached hereto as Exhibit E.*

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

117.     Petitioner has exhausted all administrative remedies. There are no administrative appeals of the Immigration Judge's affirmance of the DHS's Credible Fear Determination and return for removal order, and no other relief is otherwise available.

## IRREPARABLE INJURY

118.     The removal and deportation of JASPREET KAUR from the United States will cause irreparable injury to her. If JASPREET KAUR is removed and deported from the United States to India, it is likely that she will face persecution, severe threats to her life and safety, or will be murdered or tortured. Additionally, JASPREET KAUR's physical detention has caused her irreparable injury.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully prays that:

(1) this court issue a Show Cause Order directing the Respondents to show cause why the Writ of Habeas Corpus should not be granted and issued; directing the Respondents to explain why the Petitioner should not be released from custody and be allowed to appear in this court at a time and date to be specified;

(2) this court issue an order setting a hearing at a time and date to be specified;

(3) this court issue an emergency order staying the Petitioner's removal/deportation to India and that bars his transfer to another detention facility;

(4) enter an order enjoining Respondents from continuing to apply the Lesson Plans and any related credible fear guidance issued by Respondents on or around April 30, 2019 and September 30, 2019;

(5) enter an order enjoining Respondents from removing Petitioner without first providing him with new credible fear screening under correct legal standards or, in the alternative, full immigration court removal proceedings pursuant to 8 U.S.C. § 1229a;

(6) this court issue an order providing for an award of attorney's fees and costs; and

(7) this court issue an order providing for such other relief as may be just and reasonable.

Dated: November 25, 2019.

s/ Bashir Ghazialam
Bashir Ghazialam, Esq., CASBN 212724
LAW OFFICES OF BASHIR GHAZIALAM
P.O. Box 928167
San Diego, California 92192
Phone (619) 795-3370
Facsimile (866) 685-4543; Email: bg@lobg.net
Attorney for Petitioner